**Teresa M. DOWNEY, Plaintiff,**

v.

**The COALITION AGAINST RAPE AND ABUSE, INC., et al., Defendants.**

**No. CIV 99–3370 JBS.**

United States District Court, D. New Jersey.

May 2, 2001.

Linda Wong, James K. Haney, Wong Fleming PC, Edison, NJ, Attorneys for Plaintiff.

Lisa S. Grosskreutz, Heim, McEnroe & Urciuoli, Floram Park, NJ, Attorney for Defendant Coalition Against Rape and Abuse, Inc.

Marc I. Bressman, Budd, Larner, Gross, Rosenbaum, Greenberg & Sade PC, Cherry Hill, NJ, Attorney for Defendants Board of Chosen Freeholders of Cape May County, Office of the Prosecutor of the County of Cape May, Stephen D. Moore, and County of Cape May.

John J. Farmer Jr., Attorney General of New Jersey, by George N. Cohen, Deputy Attorney General, R.J. Hughes Justice Complex, Trenton, NJ, Attorney for Defendant Raymond Batten.

Frank L. Corrado, Rossi, Barry, Corrado, Grassi & Radell PC, Wildwood, NJ, Attorney for Defendants The Herald Newspapers and Joseph R. Zelnik.

*OPINION*

SIMANDLE, District Judge.

## I. INTRODUCTION

This matter is before the Court on the motion of plaintiff, Teresa M. Downey, for leave to file an amended complaint in the wake of this Court's Opinion and Order dated August 7, 2000, dismissing plaintiff's initial complaint for failure to state a claim pursuant to Rule 12(b)(6), Fed.R.Civ.P. The Court specifically found that plaintiff had failed to adequately specify either a colorable federal constitutional violation, or the basis for her concert of action theory of liability under 42 U.S.C. § 1983. The Court accordingly dismissed plaintiff's claims premised on federal law, and dismissed plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367(c)(3). This dismissal was without prejudice to the plaintiff's right to move within thirty days for leave to file an amended complaint curing the pleading deficiencies that the Court had identified in its Opinion.

Plaintiff now moves to renew her claims in this case, arguing that her proposed amended complaint strengthens and better states her causes of action, and additionally provides sufficient notice of the nature of her claims. All defendants except the Coalition Against Rape and Abuse (CARA) oppose plaintiff's motion to amend. Defendants' primary opposition is that the amended complaint, like the original complaint, would not withstand a motion to dismiss, and therefore granting leave to amend would be futile.

The main issue for decision here is whether plaintiff's amended complaint cures the defects present in the initial complaint, and specifically, whether plaintiff now states actionable claims premised on the federal constitution. For reasons discussed herein, the Court determines that the Amended Complaint has cured the

pleading deficiencies the Court previously identified, and will allow plaintiff to amend her complaint consistent with this Opinion. The Court also finds, however, that two of the defendants—Stephen D. Moore and Judge Raymond Batten—have established entitlement to qualified immunity upon plaintiff's claims brought under 42 U.S.C. §§ 1983 and 1985, which shall be dismissed against them, for reasons explained in Part VII, below.

## II. BACKGROUND

The events leading to plaintiff Teresa Downey's termination from her position as Executive Director of CARA are discussed in some detail in the Court's Opinion in this case dated August 7, 2000. The allegations of the proposed Amended Complaint are deemed true for the purposes of this motion. As previously noted, in April 1997 CARA hired plaintiff as its Executive Director in order to administer the work of the organization and to vigorously advocate on behalf of victims of domestic violence and sexual assault in Cape May County. (Amended Complaint ¶ 1.) CARA is a non-profit entity which receives public funds for counseling and other services rendered to victims of domestic violence and sexual assault. (Id. ¶ 34.) At the time of her appointment, plaintiff allegedly was already well known by the defendants as an outspoken critic of local government officials, largely due to her involvement in the Susan Negersmith case. (Id. ¶ 13.) The Negersmith case involved an incident where the Cape May County Coroner changed the official cause of death of a young woman from accidental death to homicide, allegedly because plaintiff's public comments concerning officials' poor handling of the case brought immense pressure to bear on the County to reopen the investigation. (Id. ¶¶ 14–15.) Plaintiff also had in the past advocated for the elimination of the then 5–year statute of limitations for rape prosecutions. (Id. ¶ 15.)

After plaintiff was named Executive Director of CARA in April 1997, defendant *The Herald* published an article on May 7, 1997 about her appointment, noting that plaintiff in the past "gave freeholders fits as she criticized the county's defense of former Coroner Dr. John Napoleon's handling of the Susan Negersmith rape-murder case." (Id. ¶ 17.) A newspaper reporter also sought comment from plaintiff, and asked her how she expected to get along with the freeholders after her involvement in the Negersmith case. Plaintiff responded "The freeholders and CARA have a common goal of reducing the incidents of domestic violence and sexual assaults. We will work with them toward achieving those goals." (Id. ¶ 18.)

In and around June 1997, as part of her job, Ms. Downey submitted to the State of New Jersey Department of Law & Public Safety Criminal Justice Division several grant applications aimed at obtaining state funding. (Id. ¶ 21.) These grant proposals contained anecdotal information from CARA's clients, and were generally critical of law enforcement and the courts in Cape May County. Although the applications did not identify individuals by name, they advanced the position that Cape May County officials were not sufficiently sensitive to the needs of victims and failed to provide them with the relief to which they were entitled under New Jersey law. (Id. ¶ 22.)

Plaintiff states that she believed that a grant application was a confidential document and that it would not become public knowledge. Nevertheless, Judge Batten, Cape May County law enforcement officials, and *The Herald* received a copy of plaintiff's grant application as it related to criticism of government performance.

Thereafter, plaintiff alleges, defendants Mr. Moore and Judge Batten, knowing that they were criticized in the grant applications, engaged in a pattern of verbal attacks on plaintiff's performance at CARA and CARA's work generally. (*Id.* ¶ 30.) As part of this pattern, defendants publicly and personally criticized plaintiff at meetings, and "caused local newspapers to publish and/or embellish on their criticisms of her", for the purpose of disparaging plaintiff, destroying her professional reputation, interfering with her employment at CARA, and depriving her of her rights of free speech, due process and equal protection. (*Id.*)

Plaintiff specifically alleges that Judge Batten and Moore verbally attacked plaintiff at a meeting of the "domestic violence working group" which was held for the sole purpose of discussing how the legal system might more effectively address the rights of victims of domestic violence. There, plaintiff alleges, defendants Judge Batten and Moore caused to have placed before each person present a copy of a newspaper story in *The Herald* (also a defendant in this suit) in which Moore and several Cape May County police chiefs denounced plaintiff for her criticism of Cape May County law enforcement in the CARA grant application. (*Id.* ¶ 32.) Plaintiff alleges that Judge Batten went on to publicly admonish her for criticizing him, asking how could she have done this to him, stating that she was being unfair, that she should personally respond to each allegation made in *The Herald*'s story, that she had committed a disservice to everyone at the present meeting, and that he would be requesting a meeting with the board of trustees of CARA to discuss the grant application. Plaintiff also alleges that defendant Moore at this meeting stated that plaintiff did not know what she was talking about, that he considered this a personal attack against him and Batten,

that he was siding with Judge Batten on this matter, and that she should respond to the criticisms she made in the grant application. (*Id.*)

Plaintiff also alleges that Judge Batten acted under color of state law in preparing written correspondence to her which further criticized her professionalism and her criticism of him and local officials in her grant application, and caused the publication of the letter by newspapers and others who had no reason to know of the letter's existence but for Judge Batten's transmission of the letter to them. (*Id.* ¶ 34.) Plaintiff alleges that Judge Batten issued this letter on official letterhead and signed it in his official capacity, "J.S.C.", so that its intended readers would be more likely to believe the letter's contents because it came from a judge. (*Id.*) In concert with this letter and in an effort to destroy plaintiff's position at CARA, plaintiff alleges, Judge Batten began refusing to refer domestic abuse matters to CARA, an agency to which he had regularly referred clientele before plaintiff criticized him. (*Id.*) CARA was the only agency designated and publicly funded to handle counseling and other social services for victims of domestic violence and sexual assault. (*Id.*)

Plaintiff also alleges that defendants Cape May County, Batten, Moore, *The Herald*, and Zelnik publicly and falsely accused plaintiff of refusing to cooperate with law enforcement officials to combat domestic violence and sexual assault. According to plaintiff, these defendants falsely accused plaintiff of canceling meetings with Judge Batten and other law enforcement officials, and causing friction with local law enforcement officials and the court. Plaintiff claims that these allegations of missed meetings left the public with the incorrect impression that she was divisive in her position as Executive Director of CARA. In truth, plaintiff main-

tains, she had not canceled any meetings with Judge Batten, and had allegedly tried to meet with him and other Cape May County officials on several occasions. (*Id.* ¶¶ 35–36.)

Plaintiff also alleges that defendants the Freeholders of Cape May County, the Office of the Prosecutor, *The Herald,* Zelnik, Moore and Batten during this same time period caused to be published several disparaging newspaper articles that grossly exaggerated or made up facts tending to tarnish plaintiff's professional reputation, and which were intended to cause her to lose her job at CARA. (*Id.* ¶ 40.) Among the articles published were the following:

- On October 1, 1997, defendant *The Herald* published Moore's criticisms of plaintiff:

 I'm losing hope we will be able to restore a working relationship with CARA in view of the fact that they have adopted, by their silence, the positions set forth by Ms. Downey. We are considering whether it would be of greater benefit to victims to be referred to counseling services which have not created such barriers to cooperation with other agencies ... [Such as] [t]he courts, local police, the prosecutor, victim witness [sic], [and] the hospital.

- On October 22, 1997, *The Herald* published a story entitled "Judge: CARA's Charges 'Uninformed'—Batten says Downey Never observed Court Proceedings She Criticized". This story excerpted the following portion of Judge Batten's letter to plaintiff concerning the grant proposal: "I invite informed and constructive criticism, but I will not allow uninformed and ill-intended criticism to flourish in the name of unfettered and irresponsible advocacy."

- On July 16, 1997, *The Herald* published an article in which Cape May County Official Ralph Sheets referred to plaintiff's grant application as "unprofessional" and also quoted official Gerald Morton as stating "he was concerned 'about the way some employees left' and he was 'concerned about Terry Downey's credentials.' "

(*Id.* ¶¶ 40(a)–40(g).)

The CARA Board of Directors terminated plaintiff from her position at CARA in July 1998. Allegedly undeterred by her firing, *The Herald* continued to publish articles critical of her tenure at CARA. For example, on July 22, 1998, *The Herald* published an article headlined "CARA Ousts Downey, 2 Resign from Board", in which the newspaper declared "Downey leaves in her wake ruptured relations with the county, the courts, the office of the County Prosecutor, and County law enforcement officials, all of whom play important roles in the agency's mission". The article also noted that "Superior Court Judge Raymond A. Batten urged Downey to attend the family court whose operations she had criticized, but she reportedly said she didn't have time." (*Id.* ¶ 44(*o*).) In this same edition of *The Herald,* defendant Zelnik wrote an opinion piece stating, "We don't know if the CARA board sacrificed Downey because it was tired of her recalcitrance, because of a staff revolt, or because it finally concluded that a persistent attitude of opposition was not the best way for the agency to perform its mission. But the main thing is, that it fired her." (*Id.* ¶ 44(p).) Another post-termination column appeared in *The Herald* on October 14, 1998 stating that "there was no harmony or dialogue between the agency and law enforcement" when Downey was Executive Director of CARA. (*Id.* ¶ 44(r).) In response to this stream of articles from *The Herald,* plaintiff alleges, certain board members of CARA wrote the Editorial

Board at *The Herald* admonishing it for publishing "onesided, slanted" articles which disparaged plaintiff and the agency. (*Id.* ¶ 45.)

In her complaint filed in this Court July 14, 1999, plaintiff claimed that the above-detailed events were the result of a "campaign" intended to disparage plaintiff, interfere with her employment, and to cause the withholding of funding and resources from CARA. (*Id.* ¶ 49–53.) As a result of defendants' actions, plaintiff alleges, members of the board of CARA were left with the false impression that plaintiff was not effectively performing her job duties. Plaintiff also contends that CARA took heed of the veiled warnings by defendants that CARA would lose funding and necessary licensing if plaintiff remained in her position. Accordingly, plaintiff argues that CARA took adverse employment action against her in order to save itself.

Plaintiff's initial complaint asserted a variety of state law claims, most notably defamation (Count IV), intentional interference with economic advantage (Count II), wrongful discharge in violation of the New Jersey Law Against Discrimination (NJLAD) (Counts VII & VIII). Plaintiff also asserted a single federal cause of action under 42 U.S.C. § 1983 (Count III). The defendants individually moved to dismiss plaintiff's Counts II, III, IV, VII, and VIII, for failure to state a claim under Rule 12(b)(6), Fed.R.Civ.P.

In the Court's Opinion granting the motions to dismiss, the main focus was upon whether plaintiff had stated actionable claims based on federal law. In the context of plaintiff's § 1983 claim (the sole asserted basis for this Court's jurisdiction) the Court found that the § 1983–based claims in plaintiff's initial complaint were too vague to withstand the defendants' motion to dismiss. (August 7, 2000 Op. at 33.)

The reasons for dismissal of plaintiff's § 1983 claim were threefold. First, the § 1983 count was dismissed because the complaint failed to adequately describe the constitutional deprivations at issue in the case. Although plaintiff stated that her constitutional claims were premised on violations of the First Amendment and the Due Process and Equal Protection clauses, the complaint only mentioned these Constitutional provisions in passing, and thus it was impossible to discern the origin of such claims. (*Id.* at 27–29.) Second, although the complaint spoke generally of actions by the "defendants", and declared that the state actors' conduct was part of a "pattern or practice", the complaint was too vague to give adequate notice as to the exact nature of this pattern or practice. Moreover, the complaint did not adequately communicate the basis for plaintiff's concert of action theory as between the various defendants, which included a mix of public and private defendants such as a Superior Court Judge, a prosecutor, and a newspaper columnist. (*Id.* at 29–31.) Third, the § 1983 count was deficient because the individual claims against the state actors were not pleaded with adequate specificity, insofar as plaintiff did not adequately explain which individual state actors allegedly committed which Constitutionally harmful acts. (*Id.* at 31–33.) Instead, plaintiff improperly "lumped all official defendants together with no specificity as to which defendant's conduct harmed her in what way." (*Id.* at 33.)

Having determined that plaintiff's § 1983 count failed to state a valid claim, the Court dismissed plaintiff's Count III pursuant to Rules 8, 9, and 12(b)(6), Fed. R.Civ.P. This ruling having eliminated the sole federal cause of action, the Court then dismissed the remainder of the complaint for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1367(c)(3) without

prejudice to either (1) re-filing all unadjudicated claims in state court or (2) moving for leave to file an amended complaint in this Court pursuant to Rule 15, Fed. R.Civ.P. (Op. at 25, 27, 37.) Plaintiff chose the latter course of action, and filed her motion for leave to file an amended complaint on October 27, 2000. This motion has been addressed by a plethora of legal briefs which have been carefully examined.

The Amended Complaint is better than the original for several reasons. First, the Amended Complaint more clearly sets forth the manner in which the County defendants allegedly interfered with plaintiff's employment with CARA. Plaintiff alleges that they did so by attempting to influence CARA board members to fire her by (a) withholding financial support such as grants, withholding indirect funding by refusing to refer social services clients to CARA, and withholding official approval of office space, (b) surreptitiously meeting with Judge Batten and the newspaper defendants to leak confidential information about Ms. Downey in order to tarnish her professional reputation, and (c) by publicly embarrassing Ms. Downey without just cause at public meetings. (*See* Amended Complaint ¶¶ 13–16, 20–28, 30–32, 35(a)-(s), 37–44, 61, 63–64, 73.)

Second, the Amended Complaint clarifies the source of the purported federal causes of action in this case. As pled in ¶ 40 of the Amended Complaint, plaintiff alleges that the defendants acted in concert to deprive her of her right to contract with a private employer in violation of the Due Process clause of the Fourteenth Amendment. Plaintiff also alleges that the defendants violated her First Amendment rights when they took action to have her fired in retaliation for her outspoken advocacy for women's rights in Cape May County. Finally, plaintiff alleges that defendants violated her right to Equal Protection under the Fourteenth Amendment inasmuch as she was fired because of gender stereotyping. This gender stereotyping theory seems to hinge on plaintiff's assumption that defendants had it in their minds that females ought to be submissive and uncontroversial, and that Downey did not fit this description. Plaintiff alleges that defendants sought, to have plaintiff fired because she did not fit their supposed preconceptions about how females ought to behave. Plaintiff cites no caselaw recognizing gender stereotyping as actionable under § 1983, and the Court is aware of none.

### III. *PLAINTIFF'S MOTION FOR LEAVE TO AMEND*

█ Leave to amend pursuant to Rule 15(a) should be freely given "in the absence of any apparent or declared reason such as undue delay, bad faith ..., repeated failure to cure deficiencies ..., undue prejudice to the opposing party ..., [or] futility of amendment". *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). *See also Arab African International Bank v. Epstein,* 10 F.3d 168 (3d Cir.1993).

█ There is no issue of delay or bad faith, and the Court finds that allowing plaintiff to amend at this stage would not unduly prejudice defendants. The Amended Complaint only elaborates upon the theories present in the initial complaint; it does not present new causes of action. Moreover, plaintiff's attempt at amendment has required very little in the way of new briefing by the defendants, who in large part rely upon arguments set forth in their previous briefs in support of their 12(b)(6) motions. Plaintiff's causes of action have not been materially changed between the original complaint and the proposed amendment thereto. Further, the Amended Complaint is an improvement

over the original, as it includes greater specificity of detail, as this Court requested in its previous Opinion in this case.

Having determined that the proposed amendment is timely presented, and that the defendants will not be unduly prejudiced by amendment, the only issue remaining issue is whether amendment would nevertheless be futile because the amended complaint would not withstand a motion to dismiss. As now discussed in Part IV below, the Court finds that the Amended Complaint is not necessarily futile in its pleading of the constitutional causes of action, and will grant plaintiff's request for leave to amend.

## IV. *PLAINTIFF'S § 1983 CLAIMS*

### A. *Section 1983 Standard*

■ Now that plaintiff has come forward with a Amended Complaint that better sets forward the basis of her claims, the Court is able to squarely address the question of whether she has stated a viable claim of deprivation of her constitutional rights. To make a prima facie case under § 1983, the plaintiff must demonstrate that a person acting under color of law deprived her of a federal right. *See Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir.1995). 42 U.S.C. § 1983 provides in relevant part that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The next step is to "identify the exact contours of the underlying right said to have been violated." *County of Sacra-*

*mento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Section 1983 is not a source of substantive rights and does not provide redress for common law torts—the plaintiff must allege a violation of a specific federal right. *Berg v. County of Allegheny*, 219 F.3d 261, 268–69 (3d Cir.2000) (citing *Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

### B. *State Action Requirement*

■ Although plaintiff's complaint asserts Due Process, First Amendment and Equal Protection claims, her ability to present such claims against state actors in federal court under the rubric of § 1983 springs from the Fourteenth Amendment, which protects only against wrongful "state action." The Fourteenth Amendment's state action requirement applies to any claim brought under § 1983; if a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action "under color of state law" for § 1983 purposes. *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 121 S.Ct. 924, 930 n. 2, 148 L.Ed.2d 807 (2001) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). "Faithful adherence to the state action requirement requires careful attention to the gravamen of the plaintiff's complaint." *Blum v. Yaretsky*, 457 U.S. 991, 1003, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). If the complaint alleges only that private misconduct caused the deprivation at issue, then a federal claim fails because the Fourteenth Amendment " 'erects no shield against merely private conduct, however discriminatory or wrongful.' " *Id.* at 1002, 102 S.Ct. 2777 (quoting *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948)). The state action requirement assures "that constitutional stan-

dards are invoked 'when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.'" *Brentwood Academy*, 121 S.Ct. at 930 (citing *Blum, supra* ) (emphasis in original).

■ In the present case, plaintiff claims that she was deprived of her Due Process, Equal Protection and First Amendment rights when she was fired from her position as Executive Director at CARA. It is important to note, however, that plaintiff has not alleged that the government actors—Cape May County, the County Prosecutor, or Judge Batten—promulgated regulations or procedures that caused plaintiff to be fired, nor has she alleged that they directly fired Ms. Downey. On the contrary, plaintiff acknowledges that she was fired by CARA, a private defendant. This lawsuit, therefore, seeks to hold public officials liable for the actions of a private defendant. Under these circumstances, state action may be found, but only if "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Id.* (internal quotation marks and citations omitted).

■ The Supreme Court has identified several instances where a private party's actions may be fairly attributed to state action. A challenged activity may be deemed state action when: (1) it results from the State's exercise of "coercive power"; (2) when the State provides significant encouragement, either overt or covert; (3) when a private actor operates as a willful participant in joint activity with the State or its agents; (4) when a nominally private entity is controlled by an agency of the State; (5) when a private entity has been delegated a public function by the State; or (6) when the private entity is entwined with governmental policies, or the government is entwined in its

management or control. *Id.* (internal quotation marks and citations omitted). Certain actions may resist being rigidly pigeonholed into any one category, thus any approach the Court uses must remain focused on the heart of the state action query: whether the challenged action can be "fairly attributed to the state." *See id.* at 935 (citing *Blum, supra.*)

The Amended Complaint loosely states that CARA's decision to fire Ms. Downey is actionable as "state action" under two theories. First, plaintiff alleges that because CARA's funding is primarily public, it serves in a quasi-governmental capacity and thus its employment decisions are tantamount to state action. (Amended Complaint ¶¶ 2, 63.) Second, plaintiff alleges that the government defendants intimidated and coerced CARA into terminating her from her position as CARA's Executive Director. (*Id.* ¶¶ 34, 44(b), 46, 53.) As now discussed, only plaintiff's coercion theory would survive a motion to dismiss.

### 1. *Quasi–Governmental Role*

■ A private party can be held to be a state actor when the government has so far insinuated itself into a position of interdependence with the private party that it was a joint participant in the enterprise. *Groman v. Township of Manalapan*, 47 F.3d 628, 641 (3d Cir.1995) (citing *Yeager v. City of McGregor*, 980 F.2d 337, 343 (5th Cir.1993)). Plaintiff recognizes that her position with CARA is not a public entity *per se.* Nevertheless, she argues that because CARA's funding is primarily public, it serves in a quasi-governmental capacity, and thus its decision to fire her amounts to state action. (Amended Complaint ¶ 27.)

■ Plaintiff's public funding argument misses the mark. The source of an agency's funding may be important in de-

termining the degree of influence that state actors had upon the agency with respect to hiring/firing determinations. However, simply because an agency accepts public funding or accepts referrals from the government does not transform that entity into a state actor. *See Rendell–Baker v. Kohn*, 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (school receiving at least ninety-percent of funds from state not a state actor); *Groman*, 47 F.3d at 639 & 642 (private volunteer first aid squad receiving referrals from police and $25,000 annually in public funds not a state actor). As this precedent makes clear, mere acceptance of public funds, without more, does not create state action on the part of a private agency. It is not alleged that the State of New Jersey or the County of Cape May were the primary source of revenue for CARA, which also received funding from private donations and from the United Way. Indeed, CARA's own letterhead announces that it is "A United Way Agency", strongly suggesting that private charities, not governmental funding, provide the main stream of revenue. (*See* Batten Cert. Exs. E, G & H.) Because it is axiomatic that most non-profits accept public funding in one form or another, the consequences of plaintiff's proposed quasi-governmental-role-by-reason-of-funding-acceptance argument would potentially have the troublesome and sweeping effect of creating a cause of action under § 1983 for fired employees of most non-profits, and the further consequence of converting non-profit employment into government employment.

Moreover, plaintiff's complaint does not allege any facts that would permit the inference that CARA was so intertwined with the State that CARA should be deemed a state actor. Although plaintiff does state that CARA was the only agency to which the Cape May courts referred victims of domestic violence, plaintiff has not alleged that the State or the County were CARA's sole source of referred clientele, that the County had any power to approve or disapprove hiring/firing decisions at CARA, nor that the government required that any public official be named to the CARA board. In short, plaintiff has not pleaded facts that would allow the conclusion that CARA was so entwined with the local government that its actions were tantamount to actions by controlling government authorities. For these reasons, the Court will strike from the Amended Complaint plaintiff's allegation that Ms. Downey's termination was the result of state action because CARA served a quasi-governmental role.

### 2. *State Coercion or Encouragement*

 Plaintiff has also alleged that her termination was state action because CARA allegedly acquiesced to concentrated government pressure to fire her. Specifically, plaintiff maintains that the government defendants strongly suggested to CARA that, unless CARA terminated plaintiff, it would face loss of grant money, loss of revenue-producing referrals, and denial of certain permits. (*See* Amended Complaint ¶¶ 34, 40(d), 44(b).)

Where state actors have "exercised coercive power or [have] provided significant encouragement, either overt or covert, [then] the choice must in law be deemed to be that of the state." *Blum*, 457 U.S. at 1004, 102 S.Ct. 2777. The Ninth Circuit's decision in *Merritt v. Mackey*, 827 F.2d 1368, 1370–71 (9th Cir.1987), provides an example of such coercion. *Merritt* involved a § 1983 wrongful termination suit brought by a former employee of a private nonprofit drug and alcohol treatment agency. The evidence showed that Merritt was fired after state and federal officials issued the treatment agency an ultimatum: fire Merritt or face complete loss

of state and federal funds. *Id.* at 1370. The Court of Appeals reversed the District Court's grant of summary judgment against plaintiff's § 1983 claim, holding that Merritt had a cause of action under § 1983 for Due Process deprivation because the government officials had coerced his employer into firing him without affording him the process he was due as described in agency policy and under Oregon employment law.

 In this case, plaintiff has not alleged that the government defendants issued a clear ultimatum to CARA that they must fire Ms. Downey. Nevertheless, the Court finds that plaintiff's state action theory survives the motion to dismiss. As noted above, plaintiff has alleged that the official defendants implied to CARA that unless Downey was fired they faced loss of grant money, loss of revenue-producing referrals, and denial of certain necessary permits. Whether plaintiff has evidence tantamount to an official ultimatum by these public officials to CARA to fire Ms. Downey remains to be seen, perhaps in future summary judgment motion practice. For the purposes of this motion, however, plaintiff is entitled to the presumption that her allegations are true. The Court must assume, therefore, that the statements outlined above amounted to coercion by the government defendants. Under such circumstances, any action taken by CARA by reason of government coercion would be deemed state action.[1] Accordingly, the Court concludes that plaintiff's § 1983 claim would not be dismissed at this early stage, and will allow her to amend her complaint to include new Count Three. This decision is made without prejudice to defendants' right to move for summary judgment against this Count at a later date.

## V. OUTLINE OF PLAINTIFF'S CONSTITUTIONAL CLAIMS

As a means of streamlining future pretrial proceedings or summary judgment motion practice in this case, the Court takes this opportunity to spell out what constitutional issues—in addition to those discussed above—it considers to be raised by this Amended Complaint. The following discussion of plaintiff's Due Process, First Amendment, and Equal Protection theories is not all-inclusive or dispositive, but the parties are advised to take note of what the applicable law is, and what their respective burdens will be under this authority as this case moves forward.

---

1. Likewise, plaintiff has alleged that this coercion was an official policy, custom, or practice of Cape May County. Plaintiff's burden at the summary judgment stage will be to show that the actions affecting her employment came as a result of policies set by an individual or individuals who possessed final decision-making authority for the County. *See Pembaur v. Cincinnati,* 475 U.S. 469, 483 & n. 12, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). The determination of who possesses what power in a local government presents a question of state law, and this issue has not been fully briefed. (*See* Br. of Office of the County Prosecutor, *et al.* at 11–12 (stating pattern or practice claim too vague to respond to).) Although plaintiff has alleged that the highest legislative body of Cape May County (the Board of Freeholders) was involved in the conduct which ultimately led to her dismissal, the complaint is devoid of detail explaining the Board's involvement. If the County's involvement is limited to that of the presiding Family Court judge and the Chief Prosecutor, the pattern or practice claim will likely fail upon summary judgment. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). For present purposes of allowing an amended complaint under Rule 15(a), however, it cannot be said that this claim against the County and its Board of Freeholders is necessarily futile.

## A. Public Speech/Issue Defenses

As the Court noted in its previous Opinion in this case, an important issue for resolution at the summary judgment stage will be defendants' proposed "public figure" defense. (August 7, 2000 Op. at 20.) The gravamen of plaintiff's complaint is that defendants publicly defamed her, and that this defamation essentially forced CARA to terminate her employment. Defamation is difficult to prove when the statements at issue revolve around a matter of public concern. Speech concerning matters of public concern is afforded strict First Amendment protection. *See Boos v. Barry*, 485 U.S. 312, 318, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); *Connick v. Myers*, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). Moreover, public officials and public figures are afforded lessened degrees of protection against libel and defamation, and statements concerning such figures will be actionable only where they were knowingly false or made with reckless disregard for their untruth. *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Accordingly, an important issue to be decided is whether plaintiff in this case is a private or a public figure. As this Court has previously noted, it appears exceedingly likely that, by (1) positing that Cape May County and its officials had not done enough for women's issues, (2) including these concerns in a public grant proposal, (3) submitting this grant proposal to the New Jersey Department of Law & Public Safety, a public agency, for (4) the purpose of obtaining public funds to protect women's rights, plaintiff had thrust the subject matter of the grant application into the public domain, thus making Ms. Downey's views, and the ensuing debate, a matter of public concern. (August 7, 2000 Op. at 21 n. 4.) If so, the First Amendment protects public statements regarding a public figure that are libelous or defamatory unless knowingly false or knowingly made with reckless disregard for their falsity. Nonetheless, for purposes of amendment to the pleadings, plaintiff's First Amendment claim is not frivolous.

## B. Due Process

Plaintiff's Amended Complaint more clearly declares that her Due Process claim is premised on an alleged deprivation of a property interest, namely, her interest in continued employment at CARA. A claim of unconstitutional deprivation of Due Process consists of three elements: (1) the defendant must deprive the plaintiff of a protectable interest; (2) that deprivation must be the result of some governmental action; and (3) the deprivation must be without due process. *Cospito v. Heckler*, 742 F.2d 72, 80 (3d Cir.1984). To determine whether due process requirements apply to an asserted interest, the Court must initially look to the nature of the interest at stake. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "[W]hen protected interests are implicated, some type of prior hearing is paramount." *Id.* at 569–70, 92 S.Ct. 2701. The question then becomes what range of property or liberty interest is implicated, since the sweep of procedural due process is not infinite. *Id.* at 570, 92 S.Ct. 2701.

It is well-settled that an individual may have a protected property interest in private employment. In *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), the Supreme Court observed that "the right to hold a specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and

'property' concepts of the Fifth Amendment." *Id.* at 492, 79 S.Ct. 1400. Although it might be argued that the interest that Ms. Downey presently claims is simply that of noninterference with a contractual relationship, *Greene* makes clear that when a private employee is deprived of her employment through government conduct, the cause of action available to that employee is not just the right to sue under state law for contractual interference. *See Merritt v. Mackey,* 827 F.2d 1368, 1370–71 (9th Cir.1987) (citing *Greene,* 360 U.S. at 493 n. 22, 79 S.Ct. 1400). When government officials are involved in the deprivation, the nature of the interest at stake in private employment is a property interest. *Id.* at 1371. *See also FDIC v. Mallen,* 486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988) (president of bank had property interest in continuing to serve as such).

 Plaintiff argues that she had a "property right" to continued employment with CARA, a private non-profit organization. (Pl. Reply Br. at 12.) The Court must inquire further, however, into whether plaintiff has sufficiently alleged that she had more than a "unilateral expectation" of continued employment; plaintiff must show a "legitimate claim of entitlement" to her position. *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. The source of any such entitlement is not the Constitution, but is rather the "existing rules and understandings that stem from an outside source, such as state law." *Robb v. City of Philadelphia,* 733 F.2d 286 (3d Cir.1984). Thus, even though plaintiff alleges illegal governmental interference with her private employment, the Court must determine whether plaintiff had a reasonable expectation of continued employment based upon state law, rules or regulations concerning discharge, or express or implied promises. *Roth,* 408 U.S. at 577, 92 S.Ct. 2701.

 Plaintiff alleges that she had a reasonable expectation of future employment based on CARA's own employment policies. According to Ms. Downey, CARA's own policies required her to advocate on behalf of victims of domestic violence, and thus CARA implicitly promised her that she would not be fired on account of fulfilling her responsibilities as an advocate. It is not suggested by the pleadings that Ms. Downey was an employee ousted from a fixed term or was other than an employee at will, unprotected by any statutory tenure, contractual commitment or collective negotiation agreement. In such circumstances, under New Jersey common law the employer has the right to discharge such employee with cause, without cause, or for no good reason at all. *Witkowski v. Thomas J. Lipton, Inc.,* 136 N.J. 385, 643 A.2d 546 (1994); *English v. College of Medicine and Dentistry,* 73 N.J. 20, 23, 372 A.2d 295 (1977). Due to the lack of a "good cause" clause in her employment contract with CARA, therefore, Ms. Downey had no reasonable expectation under New Jersey law of continued employment with CARA.[2]

 Although Ms. Downey was an at-will employee, she argues that she nev-

---

2. In the absence of a good cause provision, an individual may nonetheless have a form of property right in continued employment if that individual happens to be a government employee *see Richardson v. Felix,* 856 F.2d 505 (3d Cir.1988) (employee of Virgin Island police auxiliary); *Perez v. Cucci,* 725 F.Supp. 209 (D.N.J.1989) (city police officer), or one whose continued employment directly depends upon the good will of government officials *see e.g. Zamboni v. Stamler,* 847 F.2d 73 (3d Cir.1988) (civil service employee of county prosecutor's office has property right in employment). As this Court already has determined that CARA was not a governmental or quasi-governmental agency, it follows that Ms. Downey was not a government employee.

ertheless had a protectable interest in CARA's policy that provided for progressive discipline prior to termination.[3] (Amended Complaint ¶ 60.) CARA allegedly fired Ms. Downey without notice or an opportunity for a hearing on July 15, 1999. Plaintiff alleges that this termination violated her reasonable expectation that CARA would impose progressive discipline prior to terminating her, and deprived her of the opportunity to modify her behavior in such a way that termination might be avoided. (*Id.*) While plaintiff has not alleged that she was anything but an at will employee, and thus could not have had a reasonable expectation of continued employment with CARA, New Jersey law does provide reasonable assurance to employees that such progressive discipline policies as are actually in place will be followed without interference by state actors. *Nicosia v. Wakefern Food Corp.,* 136 N.J. 401, 643 A.2d 554 (1994). The Court concludes that if her employment agreement with CARA did provide for progressive discipline, the Due Process clause may entitle Ms. Downey to progressive discipline prior to termination, which arguably would have given her an opportunity to respond to criticism and thereby save her job, without coercion of public officials to override CARA's disciplinary policy. Whether CARA in fact had such a policy of progressive discipline rising to the level of an entitlement of em-

ployment remains to be proved by plaintiff.

Of course, establishing that she had a protectable interest in an aspect of her employment is only part of plaintiff's burden with respect to her Due Process claim. As discussed above a necessary prerequisite of her Due Process claim is that she sustain her burden of showing that the deprivation was the result of some intentional governmental action. Because ultimately the plaintiff must show that the public official defendants intended to cause her termination without progressive discipline, it is not enough to show that the CARA board merely considered the dissatisfaction and criticisms of Ms. Downey that were expressed by the defendant public officials; rather plaintiff must show that the public officials deprived her of due process by teaming up with the CARA board with the intention that she be terminated from her position. Plaintiff must also adduce evidence from which a reasonable jury could conclude that the termination came without all the process she was due. *See Cospito v. Heckler,* 742 F.2d 72, 80 (3d Cir.1984). If any of these elements are not satisfied, plaintiff's Due Process claim will fail. For present purposes, however, the Due Process claim is not futile.

### C. *First Amendment Retaliation*

■ Turning to plaintiff's claim of First Amendment retaliation, Ms. Downey

---

**3.** The defendants have not disputed plaintiff's assertion that CARA had a policy of progressive discipline before termination. It is unclear from the pleadings whether (1) this policy is written or only implied; (2) whether the policy is contained in an employment manual of some sort; and (3) whether this manual, if any, was distributed to all employees at CARA or only to Ms. Downey. All of these factors would be fact issues relevant for consideration by a jury. *Woolley v. Hoffmann–La-Roche, Inc.,* 99 N.J. 284, 285–86, 491 A.2d

1257 (1985). Other relevant considerations include the definiteness of the language involved, and whether there were specific offenses for which immediate discharge would be appropriate. *Ware v. Prudential Ins. Co.,* 220 N.J.Super. 135, 145–46, 531 A.2d 757. Of course, the chief consideration is whether these factors in combination created a "reasonable expectation" of progressive discipline before termination. *Nicosia v. Wakefern Food Corp.,* 136 N.J. 401, 643 A.2d 554 (1994).

alleges that the government defendants sought to have her fired in retaliation for her criticism of Cape May County's treatment of domestic violence victims in a grant application and because of her public comments about the *Negersmith* case.

Unlike claims of Due Process deprivation, claims of First Amendment retaliation do not require a plaintiff to allege that she had a protectable property interest in employment. As the Third Circuit stated in *Robb v. City of Philadelphia:*

> The Supreme Court has made clear that a distinction exists between the entitlement to a benefit that gives rise to a property interest protected under the Fourteenth Amendment clause and a benefit that is protected under the First Amendment. Those acting under color of state law may not deny a benefit to a person on a basis that infringes his constitutionally protected interest in freedom of speech, regardless of whether the person has a 'right' to that benefit.

733 F.2d 286, 294 (3d Cir.1984).

The gist of First Amendment retaliation claims under § 1983 is that government officials may not directly take an adverse employment action against an individual in retaliation for exercise of that individual's First Amendment rights. *See Board of County Commissioners v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (First Amendment protects independent contractors from termination or prevention of automatic renewal of at-will government contracts in retaliation for their exercise of freedom of speech); *O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) (protections generally afforded to public employees against being discharged for refusing to support political party or its candidates also extend to independent contractors). For example, in *Robb,* the plaintiff claimed

that private individuals, public officials, and the city had conspired to transfer him from one civil service position to another, less prestigious position, and had denied him a promotion in retaliation for pursuing a lawsuit against the city, his union activities, and oral statements he made to the press. The Third Circuit held that plaintiff had no due process claim, but found that "he arguably had been denied the benefits of prestige by not being continued" in his job or being promoted. *Robb,* 733 F.2d at 295. Thus, it is possible that Ms. Downey may have a claim of First Amendment retaliation even if she is unable to show that she had a property interest in her job, or that her firing violated her right to Due Process of law. Plaintiff's burden at summary judgment will be to come forward with enough evidence to create a triable issue that the reason she was fired was not because of CARA's dissatisfaction with her performance, but rather that she was fired because of the pressure brought to bear on CARA local government officials who wanted to silence her from further criticizing Cape May County and the manner in which it dealt with the victims of domestic violence.

Of course, the challenge for plaintiff at the next stage will be to deal with the inherent tension between her First Amendment retaliation claim and the main theory of her case. According to Downey's allegations, which we must accept as true for purposes of this motion, the true motive for defendants' efforts to have her fired was retaliation for her protected speech. The tension arises because plaintiff has argued that the grant applications and the ensuing controversy surrounding the applications were *not* matters of public concern, and thus defendants may not claim First Amendment protection for their allegedly defamatory remarks about her. However, if plaintiff's comments

were not a matter of public concern, then how may plaintiff herself claim First Amendment protection? The First Amendment only protects a person's right to public free speech. If this case did not involve a matter of public concern, then she cannot realistically assert a First Amendment retaliation claim. The First Amendment does not insulate a private speaker from negative consequences of her speech if her remarks are poorly received. Because the Court must at this stage presume that plaintiff will succeed on her claims, however, resolution of these concerns awaits summary judgment motion practice or trial.

### D. *Equal Protection*

 Plaintiff's claim under the Equal Protection clause is premised on the theory of "gender stereotyping." (Amended Complaint ¶ 29.) According to plaintiff, she was fired because she was an outspoken woman with whom the defendants did not want to work, "as opposed to another woman who was more passive and easier to work with, and in their mind, less abrasive." (*Id.*) The Complaint does not allege that the defendants had some particular other woman in mind to replace her, nor that they sought to replace her with a man.

The parties have not yet briefed the issue of whether plaintiff's gender stereotyping claim states a valid claim. Indeed, the Court's research has not revealed any published cases where a plaintiff claimed that discharge due to gender stereotyping—in the sense of seeking another female employee who exhibited more "female" characteristics by plaintiff's definition—was a basis for a claim under § 1983 or the Equal Protection clause. Nevertheless, because the Court must assume the allegations in the Complaint to be true, the Court will as-

sume that gender bias was somehow a motivating factor behind the government defendant's efforts to have her terminated from CARA, and the Court will not dismiss this allegation at this early stage.

Although the Court does not have the benefit of case law or briefing fully explaining plaintiff's gender stereotyping theory, the Court will attempt to provide a preliminary framework for this claim. It seems logical that in order for plaintiff's gender stereotyping claim to survive a summary judgment motion, plaintiff will be required to adduce evidence tending to show that (1) the official defendants preferred that a female in Ms. Downey's position should be submissive and easygoing, (2) that the defendants believed that Ms. Downey did not fit this preconception, and (3) that the defendants endeavored to have Ms. Downey fired at least in part because she did not fit this gender stereotype. This having been said, however, plaintiff's equal protection theory appears to fall short of alleging discrimination on the basis of her female gender. To argue essentially that the defendants terminated her employment because she was not "female enough" (in stereotypical terms) is to argue that defendants inherently sought to replace her with a different woman, negating an essential element of a gender discrimination claim. The parties have not briefed this issue. As this brief outline shows, plaintiff will bear the burden of adducing evidence concerning the defendants' state of mind if she hopes to have this claim go forward.

### VI. *Conspiracy In Violation of § 1985 and Civil Conspiracy*

 Count Ten of plaintiff's Amended Complaint alleges that all defendants conspired to deprive her of her federal constitutional rights in violation of 42 U.S.C. § 1985(3). "Section 1985(3) pro-

vides a cause of action if: (1) two or more persons conspire to deprive any person of the equal protection of the law; (2) one or more of the conspirators performs or causes to be performed any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or his property or deprives the plaintiff of any right or privilege of a citizen of the United States." *Barnes Foundation v. Township of Lower Merion*, 242 F.3d 151, 162 (3d Cir.2001) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Under both § 1985(3) and civil conspiracy claims, all of these elements must be pleaded with adequate specificity to give notice of the nature of the conspiracy alleged. Rule 9(b), Fed.R.Civ.P.; *Kronfeld v. First New Jersey Nat. Bank*, 638 F.Supp. 1454, 1468 (D.N.J.1986). In contrast to § 1983, § 1985(3) does not include a requirement that the conspirators act "under color of state law," and makes actionable private conspiracies to deprive a citizen of her rights. *Id.*

As noted above, § 1985 claims must be premised upon an alleged violation of a plaintiff's federal equal protection rights. Here, plaintiff appears to predicate her § 1985 claim on an equal protection violation based on gender stereotyping. According to plaintiff, the defendants conspired to have her removed from her position at CARA because she did not fit their conception of how a female in her position should behave. As a result of the defendants' conspiracy, plaintiff contends, she was deprived of her federal Due Process, First Amendment and Equal Protection rights. As discussed above, the Court harbors some doubt that this gender stereotyping will succeed on the merits. Nevertheless, at this early stage the plaintiff is entitled to the presumption that it will.

Turning next to the question of whether plaintiff has adequately pleaded her conspiracy claims, the Court finds that plaintiff has supported her allegations of § 1985 and civil conspiracy with more detailed fact pleading than her initial complaint. For instance, plaintiff has alleged that there were several instances where *The Herald* and Zelnik had advance knowledge of news related to the state of Ms. Downey's job security, and that *The Herald* only could have gained this knowledge via private meetings with the government defendants. (*See* Amended Complaint ¶¶ 106(a), (b) & (e).) Plaintiff has adequately pleaded which defendants she suspects of meeting with each other in furtherance of the alleged conspiracy, and what acts were allegedly done in furtherance thereof. (*See generally* Amended Complaint Counts Nine & Ten.) While it is true that plaintiff has not yet adduced direct evidence of a conspiracy, such evidence rarely exists. Instead, conspiracy is often established through inference and circumstantial evidence. *See Kronfeld*, 638 F.Supp. at 1469. At any rate, evidence is not required in order to survive a motion to dismiss. Because plaintiff has pleaded her conspiracy claims with sufficient detail to survive a motion to dismiss, the Court will permit her to amend her complaint to include Counts Nine and Ten.

## VII. *QUALIFIED IMMUNITY*

### A. *General Precepts of Qualified Immunity Defense*

The finding that plaintiff has stated actionable claims under §§ 1983 & 1985(3) does not end the Court's discussion. The Court must also determine whether the doctrine of qualified immunity protects the individual official defendants from plaintiff's claims under those sections. Defendants Judge Batten and

Moore [4] argue that the § 1983 and § 1985 claims in the Amended Complaint should be dismissed as to them because they are entitled to qualified immunity. (Batten Opp'n Br. at 28–30; Moore Opp'n Br. at 9–11.)

In the qualified immunity analysis, the first step must be to determine "whether the plaintiff has even alleged the deprivation of a right that either federal law or the Constitution protects." *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir.2000) (citing *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). This analysis, *supra*, has resulted in the threshold determination that plaintiff's claims against defendants Batten and Moore under sections 1983 and 1985 alleged conduct in violation of various federal rights under the Due Process, Free Speech and Equal Protection clauses of the Constitution. Specifically, the Amended Complaint alleges (1) that these defendants and others retaliated against her for her exercise of her First Amendment rights by forcing CARA to terminate her employment; (2) that these defendants and others deprived her of a property interest in her continued private employment at CARA in violation of the due process of progressive disciplinary measures in her at-will employment; and (3)

that these defendants and others violated her right to equal protection of the law because they criticized her and induced CARA to take action against her as an act of gender discrimination because she was more outspoken than they thought a woman should be; this third claim is also the basis of plaintiff's § 1985(3) conspiracy claim.

After determining that the Amended Complaint states the above three claims against these officials, the Court must determine (1) whether the law was clearly established at the time of the violation and the facts available to the official at that time, and (2) whether a reasonable officer could have believed his conduct was lawful. *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Paff v. Kaltenbach*, 204 F.3d 425, 437 (3d Cir.2000); *Good v. Dauphin County Social Serv. for Children and Youth*, 891 F.2d 1087, 1092 (3d Cir. 1989).

Under the doctrine of qualified immunity, government officials are immune not only from trial, but from suit altogether. *See e.g.*, *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Harlow v. Fitzgerald*,

---

4. The Court proceeds on the assumption that Judge Batten's and Moore's actions were not done in furtherance of their official duties entitling them to absolute immunity under *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), respectively. The doctrine of absolute judicial immunity applies to a judge acting in his or her judicial capacity, *see Pierson*, 386 U.S. at 553–55, 87 S.Ct. 1213, *and Stump v. Sparkman*, 435 U.S. 349, 356–57, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), and not to actions of an administrative nature unrelated to a particular case adjudication, *Forrester v. White*, 484 U.S. 219, 229–230, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). Likewise, prosecuto-

rial immunity shields prosecutors absolutely from activities that are "intimately associated with the judicial process" such as initiating and pursuing a criminal prosecution and presenting the state's case in court. *Imbler*, 424 U.S. at 430, 96 S.Ct. 984, but not the administrative and investigative duties. *Id.* at 430–31, 96 S.Ct. 984. *See also Burns v. Reed*, 500 U.S. 478, 492–496, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (only qualified immunity attaches to prosecutorial function of giving advice to police); *Hughes v. Long*, 242 F.3d 121, 125 (3d Cir.2001). Because plaintiff's allegations do not arise from the judicial or prosecutorial handling of any particular case, then, no absolute immunity is available to either official.

457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Supreme Court has explained that qualified immunity provides that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. Under this standard, a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or improperly motivated, nor do bare allegations of malice establish a constitutional claim. *Crawford–El v. Britton*, 523 U.S. 574, 588, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). When material facts are not in dispute, the district court may decide whether a government official has established the defense of qualified immunity as a matter of law. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

■ The main inquiry must be as to the objective reasonableness of the official's conduct in light of clearly established law. *Harlow*, 457 U.S. at 819, 102 S.Ct. 2727. If the law was not clearly established, then the official could not be reasonably expected to know the law forbade the subject conduct, and the qualified immunity defense must be sustained. *Id.* In this case, then, the relevant inquiry is whether Judge Batten's or Mr. Moore's conduct was objectively unreasonable in light of clearly established law which of which a reasonable official should have been aware. Therefore, the qualified immunity defenses of Judge Batten and Mr. Moore will be evaluated at this time on the basis of these pleadings.

The first issue whether the constitutional rights these defendants are alleged to have violated are "clearly established." To be a "clearly established right," the Supreme Court has stated this test:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 639, 107 S.Ct. 3034. The Court's inquiry upon this first issue is primarily legal: "whether the legal norms the defendant's conduct violated were clearly established." *Gruenke*, 225 F.3d at 299. If the right was not "clearly established" at the time of the conduct, the inquiry need proceed no further and the official will be immune from personal liability for his or her discretionary actions, because the unlawfulness would not have been objectively apparent to a reasonable official, under *Anderson v. Creighton, supra.*

■ If the right was sufficiently well-established that a reasonable official would have known of its existence, then the court must evaluate whether a reasonable official would have known that the specific conduct violated the clearly established right. The Third Circuit succinctly stated this second issue, implicating the grant of qualified immunity in terms of the defendant's alleged conduct, as follows:

> [I]t is not sufficient that the right at issue be clearly established as a general matter. Rather, the question is whether a reasonable public official would know that his or her *specific conduct* violated clearly established rights.

*Grant v. City of Pittsburgh*, 98 F.3d 116, 121 (3d Cir.1996 ) (emphasis in original) (citing *Anderson*, 483 U.S. at 636–37, 107

S.Ct. 3034). The district court, in addressing this second prong of qualified immunity, must "analyze the conduct of each individual defendant with respect to the constitutional right alleged to have been violated." *Grant*, 98 F.3d at 121. This "fact intensive analysis" must be conducted especially at this pre-discovery stage of the case, "by viewing the facts alleged in the light most favorable to the plaintiff." *Gruenke*, 225 F.3d at 300. These facts may include evidence in documents to which the Amended Complaint itself makes mention.[5]

With these precepts in mind, the Court now performs the two-pronged inquiry to determine whether defendants Batten and Moore have demonstrated their entitlement to qualified immunity from liability for plaintiff's First Amendment, Due Process and Equal Protection claims in the context of the allegations of the Amended Complaint.

**B. Qualified Immunity as Applied to This Case**

**1. First Amendment Claim**

The Court first considers whether Batten and Moore are immune from plaintiff's First Amendment retaliation claim. As explained above, the crucial inquiries are (1) whether the right to be free from official retaliation for free speech is well-established, and if so (2) whether the specific conduct at issue here should have been known to violate that right, if it occurred.

▮▮▮▮ As to the first question, the Court finds that there is a well-established right of a citizen to be free from official retaliation for exercising one's right to free speech.[6] The analysis begins with the well-established principle that a government may not fire or otherwise retaliate against one of its employees for exercising her First Amendment rights. *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Azzaro v.*

---

5. Judge Batten has attached a certification and appendix to his brief supporting his qualified immunity arguments. Although such attachments generally are inappropriate in motions to dismiss under Rule 12(b)(6), which examines the pleadings alone, these attachments may be considered because they are merely copies of letters referenced in the complaint. The court is free to examine copies of documents referenced in the amended complaint, the authenticity of which is not in dispute, without thereby converting this to a summary judgment motion, as such documents are not matters outside the pleadings. *In re Donald J. Trump Casino Securities Litigation–Taj Mahal Litigation*, 7 F.3d 357, 368 n. 9 (3d Cir.1993).

6. For the purposes of answering the question of whether defendants Moore and Batten are entitled to qualified immunity from plaintiff's First Amendment retaliation claim, the Court proceeds on the assumption that plaintiff's criticism of the performance of these Cape May County officials in a state grant application, and the officials' response to this criticism at public meetings, in written correspondence, and in newspaper interviews, constitutes a matter of public interest, which is a prerequisite to any allegation of First Amendment retaliatory discharge. If the matter is not one of public interest, then the officials are presumptively entitled to qualified immunity. *See Brown v. Armenti*, 247 F.3d 69, 77–78 (3d Cir.2001). In its recent decision in *Brown*, the Third Circuit reversed a district court's denial of an official defendant's summary judgment motion for qualified immunity from plaintiff's First Amendment retaliation claim because the record was unclear on the issue of whether the speech at issue concerned a matter of public interest. Plaintiff having failed meet his burden of showing that he was fired for speaking out on a public concern, the Court of Appeals reversed with instructions to grant the official qualified immunity from suit. *Id.* This case is distinguishable from *Brown* in that the record more clearly demonstrates that Downey's criticism, and the official response thereto, took place in the arena of public opinion. A simple survey of the many newspaper articles covering the controversy establishes that this is so.

*County of Allegheny,* 110 F.3d 968 (3d Cir.1997) (en banc); *DiMeglio v. Haines,* 45 F.3d 790, 804 (4th Cir.1995). The same First Amendment protection attaches to independent contractors working for the state. *Board of County Commr's v. Umbehr,* 518 U.S. 668, 678–79, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). A non-employee private citizen's right to be free from sanction for exercising her right to expression may be even greater than that of a state employee. *See Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Azzaro,* 110 F.3d at 975.

As discussed above, this case involves the unusual allegation that certain government officials' public denouncements of a private citizen caused an adverse employment action against that employee. This § 1983 theory hinges on the theory that the government officials' comments were so strident that defendant CARA was coerced into firing Ms. Downey. Although the facts are different from cases involving allegations of retaliatory discharge of a government employee, the same principles apply. It is clearly established that government employees and government independent contractors should be free·from official retaliation for exercising their First Amendment rights. It follows that private citizens also should be free from such official retaliation. Simply because the government officials do not make direct hiring/firing power where a citizen's employment is concerned, this does not mean that the officials lack influence to cause the citizen to be fired. In other words, the government official defendants in this case should not be insulated from a First Amendment retaliation claim simply because they caused someone else to fire Ms. Downey where they lacked the power to do so themselves. Common sense teaches that what the law will not allow you to do directly, you shall not attempt to do indirectly. *See Kendall v. U.S. ex rel*

*Stokes,* 37 U.S. 524, 605, 12 Pet. 524, 9 L.Ed. 1181 (1838). Based on the foregoing, the Court finds that there is a well-established right of private citizens to be free from official retaliation for exercise of free speech.

■ Having determined that the right of citizens to be free from governmental retaliation for exercise of free speech is clearly established, the next step in the immunity analysis is whether the specific conduct at issue—*i.e.,* defendants' public criticism of plaintiff in response to her criticism of certain aspects of county government—should reasonably have been foreseen as violating that right. That is, the Court must ask whether the official defendants reasonably should have known that their public comments about Ms. Downey would lead to her termination from employment with CARA, or whether instead the officials reasonably could have thought that their criticism of Ms. Downey and her job performance was appropriate in the context of the facts underlying this case.

In analyzing this question, it is important to note that, at bottom, plaintiff is complaining that she was fired because of defendants' campaign of public criticism of her work performance. Plaintiff alleges, *inter alia,* that Judge Batten inappropriately published a letter responding to the grant application and caused this same letter to be published in *The Herald.* Plaintiff also alleges that Judge Batten maliciously began refusing to refer domestic violence victims to CARA, that Moore verbally attacked her at a public meeting in response to the criticisms present in the grant application, and that Moore and Batten had a hand in causing to be published a series of newspaper articles in *The Herald* critical of Ms. Downey.

The objectionable remarks by Moore and Batten concerned only matters of Ms. Downey's job performance vis a vis the Cape May courts. Indeed, these defendants may well have seen their comments regarding Ms. Downey as an appropriate part of defending their own job performance against Ms. Downey's criticism of the Cape May courts in a State grant application. Furthermore, Judge Batten's comments about refusing to refer any more clients to CARA may have based on his personal opinion that CARA's administration under Downey was too unproductive and confrontational and was not working in the best interests of domestic violence victims in Cape May County, rather than a desire to cause Ms. Downey to be fired. Plaintiff does not allege that any of the criticism aimed at her was anything but work related, and no private or personal information about Ms. Downey was used as a means of attack. Because Batten and Moore's public statements about Downey's performance could reasonably have been considered by them to be a matter of defending how they did their own jobs as judge and prosecutor, it is difficult to understand how these defendants reasonably should have known that strong criticism of Ms. Downey, uttered in public fora, was somehow unconstitutional conduct. In the context of the facts underlying this case, the Court concludes that an official in the position of Judge Batten or Mr. Moore could have reasonably believed that it was fair play to address public criticism with public rebuttal criticism confined to the matter of public concern. The Court concludes that under all the relevant circumstances, defendants Moore and Batten could have reasonably believed that their conduct was constitutionally appropriate. Accordingly, their motion for qualified immunity will be granted as against plaintiff's First Amendment claim. Such claim against Judge Batten and Mr. Moore will be dismissed.

### 2. Due Process Claim

■ The Court next considers whether plaintiff's Due Process claim survives defendants' qualified immunity motion. The first point of analysis is whether the specific right allegedly violated is clearly established. As noted previously, the Court must determine whether plaintiff had a reasonable expectation of continued employment based upon state law, rules or regulations concerning discharge, or express or implied promises. See Roth, 408 U.S. at 577, 92 S.Ct. 2701. Plaintiff has argued that she had a right under state law to progressive discipline prior to termination, thus, the question becomes whether a denying a private employee her right to progressive discipline under New Jersey law would deprive that employee of her Due Process rights.

Plaintiff has cited no authority standing for the proposition that there is a clearly established right under New Jersey law for at-will employee of a private agency to receive progressive discipline prior to termination. Most likely, any right that Ms. Downey had to progressive discipline flowed from an individual understanding between her and CARA, not a clearly established or contractually based property interest in progressive discipline. As noted above, under New Jersey law, an at-will employee may be fired any time, any place, and for any reason not offending constitutional or statutory law. While government employees may have an established property interest in continued employment, plaintiff's argument that private sector employees have the same due process expectations seems to be without foundation in law.

Even assuming for the sake of argument that Ms. Downey did have a clearly estab-

lished property interest arising from an expectation of progressive discipline imposed prior to termination, the denial of which deprived her of her due process rights, the facts alleged in the Amended Complaint would not overcome Batten and Moore's assertion of qualified immunity. In the context of this case, a government official in Batten or Moore's positions could reasonably believe that the performance-related criticism and implied threats directed at CARA and Ms. Downey did not offend her (novel) right to the due process of stepwise discipline. Based on the foregoing, the Court concludes that the Due Process right alleged to have been violated was not clearly established, and that defendants could reasonably have believed that their conduct was appropriate and not violative of any constitutional right held by plaintiff. Accordingly, under *Harlow* and its progeny defendants Batten and Moore are immune from plaintiff's § 1983 claim to the extent that she alleges a violation of her Due Process rights, and this claim against them must be dismissed.

### 3. *Equal Protection Claim*

■■■ The Court next considers whether Moore and Batten are immune from plaintiff's Equal Protection claim.

As previously discussed, the contours of plaintiff's claim in this regard are that the defendants engaged in "gender stereotyping," and that she was fired because she was an outspoken woman with whom the defendants did not want to work. The Complaint does not allege that the defendants had some particular other woman in mind to replace her, nor that they sought to replace her with a man. The Court's research has not uncovered any authority endorsing gender stereotyping as a cause of action under § 1983. In light of the lack of legal support for plaintiff's gender stereotyping theory, defendants' conduct can hardly be said to have violated well-established principles of law.[7] Because plaintiff's Equal Protection claim does not rest on clearly established law, defendants Batten and Moore accordingly are entitled to immunity from plaintiff's Equal Protection claim. This claim against Batten and Moore must be dismissed.

### 4. *Summary of Qualified Immunity Analysis*

■■■ Defendants Stephen D. Moore and Judge Raymond Batten are immune from plaintiff's claims against them brought under 42 U.S.C. § 1983. Since Batten and Moore are immune from the

---

7. In contrast to plaintiff's novel stereotyping theory, the right to be free from intentional gender discrimination by a state actor has been clearly established at least since the 1970s. *See Davis v. Passman*, 442 U.S. 228, 234–35, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (Fourteenth Amendment confers a federal constitutional right to be free from gender discrimination at the hands of governmental actors). Thus a reasonable official would understand that the law prevents government officials from intention conduct designed to impede a person's career because of her gender. *See Lindsey v. Shalmy*, 29 F.3d 1382 (9th Cir.1994). The basic elements of a gender discrimination claim under the Fourteenth Amendment or Title VII requires that the plaintiff prove adverse action taken against her on account of her gender, when compared with the treatment of men. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The test for § 1983 gender discrimination is the same as for Title VII claims. *See Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997) Plaintiff has not alleged disparity between the way that she was treated as compared with males. Because plaintiff's Equal Protection claim falls outside traditional gender discrimination jurisprudence to this extent, her gender stereotyping claim does not rely on clearly established law.

§ 1983 claim, they are also immune from plaintiff's conspiracy claim brought under 42 U.S.C. § 1985(3). The § 1983 qualified immunity analysis applies equally to claims brought against public officials under § 1985; if an official is immune from suit under § 1983, that official also is immunized from suit under § 1985(3). *See Bisbee v. Bey*, 39 F.3d 1096, 1102 (10th Cir. 1994). Moreover, because Batten and Moore are immune from plaintiff's claim brought under the Equal Protection claim, these defendants cannot be held liable for conspiring to violate her Equal Protection rights. Without an equal protection claim against Batten and Moore, plaintiff's § 1985 claim—which is premised on a violation of Equal Protection—fails. Plaintiff's § 1985 claims against Batten and Moore will therefore be dismissed.

### CONCLUSION

For the reasons discussed above, the Court will grant plaintiff's motion for leave to file an amended complaint, and will re-open this case upon the Court's docket. Plaintiff shall file her Amended Complaint within seven (7) days. However, defendants Stephen D. Moore and Judge Raymond Batten are immune from plaintiff's claims brought under 42 U.S.C. §§ 1983 and 1985, and the claims brought under those statutes against those defendants shall be dismissed. Accordingly, Counts III and X are dismissed as against defendants Moore and Batten.

The accompanying Order is entered.

### ORDER

THIS MATTER having come before the Court on plaintiff's motion to file an amended complaint pursuant to Rule 15, Fed.R.Civ.P., and the Court having considered the parties' submissions, and for the reasons discussed in today's Opinion;

IT IS this —— day of May, 2001 hereby

**ORDERED** that plaintiff's motion is **GRANTED,** and this case is hereby **RE-OPENED** upon the Court's docket; and

IT IS FURTHER ORDERED that plaintiff shall cause the Proposed Amended Complaint to be filed with the Clerk within seven (7) days hereof; and

**IT IS FURTHER ORDERED** that plaintiff's allegation that defendant CARA is a quasi-governmental entity is hereby **STRICKEN** from the Amended Complaint; and

**IT IS FURTHER ORDERED** that defendants Judge Raymond Batten and Stephen D. Moore are immune from plaintiff's claims against them under 42 U.S.C. §§ 1983 & 1985(3), and plaintiff's Counts III and X are accordingly **DISMISSED** as to defendants Moore and Batten; and

**IT IS FURTHER ORDERED** that the defendants shall within ten (10) days of the filing of the Amended Complaint serve their Answers to the remaining allegations therein.